STATE of Utah, Plaintiff and Appellee,

v.

Michael Anthony ARCHULETA, Defendant and Appellant.

No. 900041.

Supreme Court of Utah.

March 25, 1993.

Rehearing Denied May 11, 1993.

R. Paul Van Dam, Atty. Gen., Charlene Barlow, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Michael D. Esplin, Provo, for defendant and appellant.

HALL, Chief Justice:

Defendant Michael Anthony Archuleta appeals his conviction for first degree murder[1] and the sentence of death imposed on the conviction.[2] Defendant and co-defendant Lance Conway Wood were charged with the murder of Gordon Ray Church, which took place during the early morning hours of November 22, 1988. The two defendants were tried separately.

A jury convicted defendant of first degree murder, finding beyond a reasonable doubt that four aggravating circumstances existed to support the conviction.[3] Following a penalty hearing, the jury returned a verdict of death on the first degree murder conviction. At formal sentencing, the trial court imposed the death sentence. Defendant raises numerous issues on appeal. After consideration of these issues and review of the entire record, we affirm.

---

1. Utah Code Ann. § 76-5-202. This section, formerly entitled "Murder in the First Degree," was amended and renamed "Aggravated Murder" in 1991. We refer to the version in effect at the time the offense was committed.

2. *Id.* § 76-3-207.

3. The jury found that the following aggravated circumstances existed to support a verdict of guilty of first degree murder: (1) kidnapping;

(2) aggravated kidnapping; (3) object rape; and (4) "[t]he homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." Utah Code Ann. § 76-5-202(1)(d), (q).

## I. FACTS

On November 21, 1988, defendant was living in an apartment in Cedar City, Utah, with co-defendant Wood and their girlfriends, Paula Jones and Brenda Stapley. Defendant, who was on parole at the time, had returned to Cedar City from Arizona, where he was living pursuant to his parole agreement. He left Arizona without permission from his parole officer in Utah County, precipitating issuance of a parole warrant for his arrest.

While in Cedar City, defendant contacted his parole officer, who gave him permission to stay there for one week to look for a job. However, a parole officer from Cedar City discovered that defendant was living with Wood, also a parolee, and was therefore again in violation of parole guidelines. The two parole officers spoke, and the Cedar City officer decided to execute a "parole hold" for defendant.[4] On November 22, 1988, Cedar City authorities went to the apartment where defendant was living, but failed to locate him.

On the evening of November 21, defendant and Wood went to the 7–Eleven store in Cedar City, where they first met Church. The three men decided to "cruise" the town's main street in Church's car. While thus engaged, they met two young women whom they stopped and spoke with for a short time. The women both testified at defendant's trial, placing defendant and Wood with Church before the murder.

Later in the evening, the three men drove to a secluded area in nearby Cedar Canyon. Church informed defendant that he was a homosexual. It is unclear exactly what happened next. Either Church or defendant offered to engage in anal sex. Defendant placed a condom on his penis and began to have anal sex with Church. Defendant then changed his mind and stopped. Shortly thereafter, Wood began to attack Church. He chased Church and tackled him to the ground, breaking Church's arm in the process. Wood pulled out a knife and cut Church across the throat, producing a superficial wound in the shape of an "x."

Defendant and Wood bound Church with tire chains and a bungee cord. They placed him in the trunk of the car, drove through Cedar City, and headed north on Interstate 15 toward Salt Lake City. After driving approximately 76 miles with Church in the trunk of the car, defendant and Wood pulled off the highway in a secluded area known as "Dog Valley." After removing Church from the trunk, they attached battery cables to Church's testicles and to the car battery. They beat Church severely on the head with a tire jack and tire iron. Then they inserted the tire iron into Church's rectum, forcing it eighteen inches into his body and puncturing his liver.[5]

When Church was apparently dead, defendant and Wood dragged his body up a hillside and attempted to cover the body with tree branches and dirt. The two men drove Church's car to Salt Lake City in the early morning hours of November 22 and abandoned it there. While in Salt Lake City, they visited several people. Defendant had a good deal of blood on his pants, and he and Wood told the people they met that they had been hunting and skinning rabbits. The two men hitchhiked back to Cedar City that same day.

4. Utah Code Ann. § 77–27–11(2) provides that a parolee may be detained for a "suspected violation of parole" for a period of 72 hours without first obtaining a warrant.

5. At trial, the medical examiner testified that Church's face was completely distorted due to multiple blows to the jaw, cheek, and eye areas with a blunt instrument. The entire left side of his head was concave, and at least eight large lacerations were apparent on his skull. Skull fractures were beneath the lacerations. Church also had multiple bruises and lacerations on his body, including puncture wounds in his back consistent with being poked with pliers. According to the medical examiner, the cause of death was severe injury to the brain due to multiple blows to the head. · A contributing cause of death was the penetrating injury to the liver and abdomen caused by insertion of the tire iron into Church's rectum. Church was found naked from the waist down, with a gag around his mouth and the tire chains wrapped tightly around his neck.

That evening, Wood contacted authorities and informed them of his and defendant's participation in the murder. After Wood's confession, defendant was arrested at the Cedar City apartment on the parole hold.

After his arrest, defendant gave four separate statements about the murder to law enforcement officers. The trial court denied his motion to suppress the statements, finding that they were voluntarily and knowingly given pursuant to defendant's valid waiver of his *Miranda*[6] rights and his privilege against self-incrimination.

Defendant raises numerous claims on appeal. The most significant are that the trial court committed reversible error by (1) refusing to grant defendant's motion to suppress statements he made to police; (2) wrongfully dismissing a prospective juror for cause; (3) denying defendant's motion in limine to exclude evidence of sodomy; (4) refusing to grant defendant's motion for mistrial based on the admission of certain testimony at trial; and (5) incorrectly instructing the jury concerning one of the aggravating circumstances under Utah Code Ann. § 75–5–202. Defendant also raises a question regarding the proportionality of the death sentence. We deal with each issue in turn.

## II. USE OF DEFENDANT'S STATEMENTS AT TRIAL

Defendant objects to the trial court's denial of his motion to suppress statements he made to police on two grounds. The first is that his arrest on the 72–hour parole hold was an illegal pretext arrest used solely to elicit damaging statements from him in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. The second is

that his statements were not made pursuant to a knowing and voluntary waiver of his right to counsel and his right against self-incrimination under the Fifth Amendment of the United States Constitution.

■ When reviewing a trial court's decision to admit a confession, we must determine if, based upon the totality of the circumstances, using the confession was proper.[7] The trial court's factual determination will be overturned only if it is clearly erroneous; the court's legal conclusions based upon those factual findings are reviewed under a correction of error standard.[8]

### A. *Pretext Arrest*

■ We first consider whether defendant's arrest on the parole hold was an unconstitutional pretext arrest. Defendant claims that he was arrested for the sole purpose of gathering evidence against him on the murder charge, not for the purpose of accomplishing a valid arrest on the parole hold. Defendant cites to evidence in the record showing that the arresting officers intended to question him about the murder while he was in custody on the parole hold. This, he argues, constitutes an improper motive on the part of the police and renders his subsequent statements tainted.

The trial court denied defendant's motion to suppress, finding that the police had a legitimate reason to detain defendant on the parole hold. Further, the trial court found that the fact that the officers were aware that defendant was a suspect in Church's murder at the time he was arrested did not make it an improper pretext arrest. We agree with the trial court's reasoning.

■ An arrest may not be used solely as a pretext to search for evidence of another

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. *See State v. Bishop,* 753 P.2d 439, 463 (Utah 1988).

8. *Cf. State v. Ramirez,* 817 P.2d 774, 782 (Utah 1991).

crime.[9] However, if police have a valid right to arrest an individual for one crime, it does not matter if their subjective intent is in reality to collect information concerning another crime.[10] "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him [or her] at the time,' and not on the officer's actual state of mind at the time the challenged action was taken."[11] If the police action would have been taken against an individual "even absent the 'underlying intent or motivation,' there is no *conduct* which ought to have been deterred and thus no reason to bring the Fourth Amendment exclusionary rule into play for purposes of deterrence."[12] In other words, if the alleged pretext arrest could have taken place absent police suspicion of the defendant's involvement in another crime, then the arrest is lawful.

Here, defendant's parole officer initially told defendant that he could remain in Cedar City and look for employment. However, the officer subsequently discovered that defendant was living with Wood, another parolee, in violation of parole guidelines. After discussing defendant's situation with another parole officer, the two officers decided to detain defendant on a 72–hour parole hold.

Thus, the officers did have a valid, independent reason to detain defendant separate from the murder investigation. In fact, police officers actually went to the apartment in Cedar City to arrest defendant on the parole hold on the afternoon of November 22, after the murder had taken place but before they knew anything about the crime. Although the officers were unable to locate defendant at that time (he was with Wood, hitchhiking back to Cedar City after disposing of Church's car in Salt Lake City), they would have arrested him if he had been found.[13]

Based on defendant's living situation and his unauthorized return to Cedar City, the arrest on the 72–hour parole hold was proper. The arrest was not rendered invalid solely because the officers had a separate motive for arresting him, especially where defendant would have been arrested even if the murder had not taken place. Hence, we affirm the ruling of the trial court on this issue.

### B. *Knowing and Intelligent Waiver*

Defendant claims that the trial court erred when it determined that the waiver of his right to counsel and his right against self-incrimination was made knowingly, intelligently, and voluntarily. Specifically, he alleges that at the time he originally waived his rights (after initially invoking his right to have counsel present), he was incompetent and incapable of making a valid waiver.

■ *Miranda* warnings are intended to guard against the "inherently coercive na-

9. *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *see also State v. Arroyo,* 796 P.2d 684, 687–88 & n. 3 (Utah 1990).

10. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1.4(e) (2d ed. 1987) [hereinafter *Search and Seizure* ].

11. *Maryland v. Macon,* 472 U.S. 463, 470, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 138–39 n. 13, 98 S.Ct. 1717, 1722, 1723–24 n. 13, 56 L.Ed.2d 168 (1978)).

12. *Search and Seizure* § 1.4(e), at 93 (emphasis in original) (footnote omitted).

13. *See Horne v. Commonwealth,* 230 Va. 512, 339 S.E.2d 186 (1986). When the police arrested the defendant in *Horne* on two outstanding misdemeanor warrants, they also suspected him of committing a murder. In holding that the arrest on the misdemeanor warrants was not an unlawful pretext arrest, the court stressed that the warrants predated the murder investigation and that earlier efforts to execute them had been made. *See id.* 339 S.E.2d at 190. The court noted, "Had there been no murder investigation, Horne would still have been arrested *if he could have been found." Id.* (emphasis added). We find Archuleta's situation to be substantially similar to that of Horne.

ture of a custodial police interrogation by fully informing the suspect of the state's intention to use any self-incriminating statements to secure his [or her] conviction."[14] Once the accused has been advised of his or her rights, he or she may waive these rights, but must do so knowingly, voluntarily, and intelligently.[15]

■ Under this standard, a waiver must have been the product of a " 'free and deliberate choice rather than intimidation, coercion or deception' and executed with 'full awareness both of the nature of the right being abandoned and [of] the consequences of the decision to abandon it.' "[16] Further, once an accused has invoked the right to counsel, he or she cannot be subject to further interrogation until counsel is provided, unless the accused "initiates further communication, exchanges, or conversations with the police."[17]

The record reveals that defendant was interviewed several times by different police officers. At the first interview (on the morning of November 24), conducted by Sgt. Charles Stewart, defendant invoked his right to counsel after being advised of his rights. The interview was terminated immediately thereafter.

Later that day, defendant initiated contact by asking to speak to a police officer. He spoke with two officers, Lt. Norman Hulet and Officer Richard Dickenson, and was again read his *Miranda* rights. Lt. Hulet testified that defendant said that he understood his rights and wanted to speak to the officers anyway. Lt. Hulet also testified that defendant seemed to be in good health and did not appear to be intoxicated or under the influence of drugs and that although defendant "jumped around a lot" and was "confusing" at first, he then "became calmer" and "was able to relate most of the events of his involvement."

Defendant made several telephone calls during the course of the interview and was provided with food and refreshments.

Later on the evening of November 24, defendant was again interviewed by Sgt. Stewart. After he was again advised of his *Miranda* rights, the following colloquy took place:

Stewart: Do you understand each of these rights that I have explained to you?

Archuleta: Yeah.

Stewart: Having these rights in mind, do you want to talk to us now?

Archuleta: Yeah, I can talk.

On November 27, 1988, Sgt. Stewart sought to interview defendant again. However, about ten minutes into the interview, defendant again requested to have his attorney present, and the interview was immediately terminated. Finally, on December 2, defendant voluntarily sought to speak to Sgt. Stewart, and after waiving his *Miranda* warning again, he gave another statement.

■ The record reveals that the officers involved scrupulously honored defendant's rights, including his desire to terminate the various interviews. The sessions did not begin again until defendant voluntarily initiated contact, was read his *Miranda* warning, and waived his rights. We therefore affirm the trial court's ruling that the statements were given voluntarily and that the statements were not the result of intimidation, coercion, or deception.

■ The record also supports the trial court's conclusion that defendant made a knowing and intelligent waiver of his *Miranda* rights before he made any statements to police. According to the testimony of the officers who interviewed him,

14. *State v. Strain*, 779 P.2d 221, 224 (Utah 1989) (citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986)).

15. *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)).

16. *Id.* (quoting *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141) (brackets in original).

17. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).

defendant was competent at all times and, as the trial court noted, was "quite familiar with the criminal law system and showed no sign of fatigue or illness." We therefore decline to disturb the trial court's ruling on the admissibility of the statements.[18]

## III. DISMISSING A JUROR FOR CAUSE

Defendant next claims that the trial court erred by granting the State's motion to dismiss a juror for cause. According to defendant, the juror was dismissed on the mistaken assumption that she was incapable of imposing the death penalty. That error, he continues, is prejudicial and warrants reversal.

▮▮▮ We begin by noting the appropriate standard of review. A trial court's decision to grant a motion to dismiss a juror for cause is reviewed for abuse of discretion.[19] Under the abuse of discretion standard, we determine whether the trial court's ruling "was beyond the limits of reasonability."[20] However, even if the trial court abused its discretion, we will reverse only if we find that the error is harmful.[21]

Utah Rule of Criminal Procedure 18(e)(10) provides that a juror may be excused for cause in a capital case if he or she entertains "such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction regardless of the facts." However, a juror may also be removed for cause under rule 18 for exhibiting "any mental or physical infirmity which renders one incapable of performing the duties of a juror." [22]

▮▮▮ The record of the voir dire proceedings does not support defendant's assertion as to why the juror was dismissed. During questioning by the trial court and counsel, the juror revealed that she recently had been taking medication for depression and that her depression could affect her during the trial and the subsequent deliberations. The trial judge dismissed her for cause based on "the extreme difficulty as well as the depression that she's been under, and the fact that [her condition] could intervene and affect her ability to deliberate." The judge concluded that "there are circumstances in this case that could be very depressing. It could exacerbate a problem that may not be on the surface right now, but could at a crucial time intervene. So that's the reason that I'm going to allow the excuse for cause."

Hence, the juror was dismissed, not because she was incapable of imposing the death penalty, but because a mental infir-

---

**18.** Defendant also claims that the trial court erred by failing, in its findings of fact and conclusions of law concerning admissibility of the statements, to make a proper finding concerning the knowing and intelligent requirement of a valid waiver. Instead, defendant argues, the court focused primarily on the voluntary prong of the waiver analysis. Although the trial court's findings and conclusions are unclear, the court does discuss defendant's awareness of his rights, his knowledge of the seriousness of the crime and the potential penalties he faced, and his familiarity with the criminal justice system. It is incumbent upon trial courts to find the facts specially and state separately their conclusions of law on all material issues. *See* Utah R.Civ.P. 52(a) (made applicable to criminal cases by virtue of Utah R.Crim.P. 26(7)); *College Irr. Co. v. Logan River & Blacksmith Fork Irr. Co.*, 780 P.2d 1241, 1245 (Utah 1989). However, when a trial court's findings and conclusions are less than crystal clear, we may "search [the record] for grounds upon which they may be upheld." *Allen v. Prudential Property & Casualty Ins. Co.*, 839 P.2d 798, 800 (Utah 1992). In this case, the record provides ample support for our determination that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

**19.** *State v. Gotschall*, 782 P.2d 459, 462 (Utah 1989); *State v. Bishop*, 753 P.2d 439, 451 (Utah 1988).

**20.** *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992).

**21.** *Id.; see also Gotschall*, 782 P.2d at 462; *State v. Larson*, 775 P.2d 415, 419 (Utah 1989); *State v. Verde*, 770 P.2d 116, 120 (Utah 1989).

**22.** Utah R.Crim.P. 18(e)(2).

mity rendered her incapable of performing her duties as a juror. Because the ruling below is supported by the record and by Utah Rule of Criminal Procedure 18(e)(2), no abuse of discretion occurred.[23]

## IV. EVIDENCE OF SODOMY USED AT TRIAL

■ Defendant next objects to the use at trial of his statement that he and Church engaged in sodomy. This objection stems from the fact that defendant was originally charged with forcible sodomy, but the charge was dismissed at the preliminary hearing due to lack of independent evidence besides his own statement.[24] Since the forcible sodomy charge was dismissed, defendant argues, use of the sodomy evidence was prejudicial and resulted in reversible error.

Before addressing defendant's argument, we note the applicable standard of review. Defendant's challenge to the admissibility of the sodomy evidence is premised on rule 403 of the Utah Rules of Evidence:

In reviewing a trial court's ruling on the admissibility of evidence under rule 403, we will not overturn the court's determination unless it was an "abuse of discretion." To state the matter more precisely, we review the trial court's 403 ruling admitting or denying admission to evidence by deciding whether, as a matter of law, the trial court's decision that "the unfairly prejudicial potential of the evidence outweighs [or does not outweigh] its probativeness" was beyond the limits of reasonability. Of course, like any other evidentiary ruling, an erroneous decision to admit or exclude evidence based on rule 403 cannot result in reversible error unless the error is harmful.[25]

■ Defendant is correct in his assessment that a person may not be convicted for a crime based solely on an incriminating statement he or she made.[26] However, he was not convicted of sodomy or forcible sodomy; he was convicted of first degree murder. A person is guilty of capital murder under section 76–5–202 if he or she intentionally or knowingly causes the death of another under any of seventeen different aggravating circumstances.[27] One of the aggravating circumstances defendant was charged with and convicted of was causing the death of the victim while defendant was engaged in the commission of or flight after committing kidnapping or aggravated kidnapping.[28] Based on that charge in the information, both the magistrate who presided over the preliminary hearing and the trial judge ruled that evidence of sodomy could be received to establish the existence of aggravated kidnapping, because sodomy is a predicate act to a finding of guilt under Utah's aggravated kidnapping statute.[29]

The trial court also relied on our decision

23. Because the juror was dismissed due to her mental state and not because of any perceived inability to impose the death penalty, we do not reach defendant's claim that her exclusion raises a constitutional question under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

24. The corpus delicti rule states that a person may not be convicted of a crime if no independent evidence, outside of the defendant's own statement, exists. To satisfy the doctrine, the State must establish by clear and convincing evidence that the injury or harm specified in the crime occurred and that the injury or harm was caused by someone's criminal activity. *State v. Allen*, 839 P.2d 291, 301 (Utah 1992); *State v. Kimbel*, 620 P.2d 515, 517 (Utah 1980); *State v. Knoefler*, 563 P.2d 175, 176 & n. 2 (Utah 1977).

25. *Hamilton*, 827 P.2d at 239 (brackets in original) (citations omitted); *accord Verde*, 770 P.2d at 120.

26. *See supra* note 24 and accompanying text.

27. *See* Utah Code Ann. § 76–5–202(1)(a) through (q).

28. *Id.* § 76–5–202(1)(d).

29. The aggravated kidnapping statute, Utah Code Ann. § 76–5–302, provides:

(1) A person commits aggravated kidnapping if the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner, seizes, confines, detains, or transports the victim with intent:

in *State v. Bishop*[30] to support its ruling on this matter. In *Bishop*, this court rejected the defendant's assertion that aggravating circumstances are a part of the corpus delicti of first degree murder and therefore must be proven with information other than the defendant's confession or admission.[31] Here, defendant's statements concerning sodomy were properly admitted to establish the elements of aggravated kidnapping, which is itself an aggravating circumstance of first degree murder. Hence, we find no abuse of discretion and affirm the decision of the trial court on this issue.

## V. MOTION FOR MISTRIAL

 Defendant's next point on appeal is that the trial court erred by refusing to grant his motion for mistrial based on the questionable testimony of one of the State's witnesses. At trial, the State presented testimony from Anna Luce, who met and spoke with Wood, Archuleta, and Church in Cedar City while the three men were "cruising" in Church's car prior to the murder. Luce was interviewed by police after the incident and testified at the preliminary hearing as well. She was asked several times to describe what defendant was wearing. At trial, Luce was again asked to describe defendant's clothing. She then stated for the first time that defendant was wearing a knife in a scabbard strapped to his right hip when she saw him the evening of the murder. Luce had not mentioned the scabbard in any of her previous interviews or when she testified at the preliminary hearing.

Defendant objected to Luce's surprise testimony at trial, and the court discussed the matter in chambers with counsel for both sides. The prosecutors revealed that when they were interviewing Luce the evening before she testified at trial, she mentioned the scabbard to them for the first time. The State's attorneys admitted that they failed to supply the newly revealed information to defendant before they elicited it from Luce at trial. Defendant then moved for a mistrial, arguing that the evidence was highly prejudicial and had not been produced as required. After much deliberation and discussion with counsel, the trial court denied the motion for mistrial and instead issued a curative order and motion to strike, which was read to the jury.

The curative order stated (1) that the testimony concerning the scabbard "was not provided by the State to the defendant by way of discovery and that the Court deems it to be not credible"; (2) that the testimony was inadmissible; and (3) that the prosecution possessed no information that defendant inflicted a cut on the victim and, conversely, it was the prosecution's position that Wood, not defendant, was the one who possessed the knife and cut Church across the throat.

Defendant asserts that the curative order was not adequate to correct the prosecutorial error. He attacks the prosecution's failure to disclose the evidence and also claims that the State knowingly presented false testimony at trial. These errors, defendant claims, were prejudicial and amounted to a denial of his right to due process guaranteed in the United States and Utah Constitutions.[32]

 Utah Rule of Criminal Procedure 16(a) imposes a duty on the prosecutor to

---

....
 (e) To commit a sexual offense as described in Part 4 of this chapter.
 Part 4, in turn, includes the acts of sodomy and forcible sodomy. Utah Code Ann. § 76–5–403. Hence, if a person commits sodomy or forcible sodomy in the course of a kidnapping, that person is guilty of aggravated kidnapping.

**30.** 753 P.2d 439 (Utah 1988).

**31.** *Id.* at 477–78. We elaborated that the corpus delicti of murder has only two components: (1) proof that the victim is actually dead, and (2) proof that the death was caused by criminal means. *Id.* at 478 (citing *State v. Rebeterano*, 681 P.2d 1265, 1267 (Utah 1984)).

**32.** U.S. Const. amends. V, XIV; Utah Const. art. I, § 7.

provide discovery material to the defense on request. This duty is continuous [33] and applies whether a prosecutor is responding to a court order or is voluntarily producing information.[34] Here, the State voluntarily adopted an open file policy and provided the defense with copies of Luce's interviews with police. However, the State knowingly failed to supplement information concerning the change in Luce's testimony on the eve of trial. Hence, as the trial court correctly found, the State violated its duty under rule 16(a).

Having determined that the State violated its discovery duty, the next question is whether the trial court erred by issuing a curative order instead of granting a mistrial. Rule 16(g) provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, *or it may enter such other order as it deems just under the circumstances.*[35]

Hence, the trial court "has ample power to obviate any prejudice resulting from a breach of the criminal discovery rules" and may fashion a remedy as it sees fit so long as the substantial rights of the defendant are not violated.[36]

This court has defined the standard for determining when the substantial rights of a defendant have been affected such that reversal is warranted. Under this standard, an error based on nondisclosure by the prosecution warrants reversal

" ' "only if a review of the record persuades the court that without the error there was a *reasonable likelihood of a more favorable result* for the defendant." ' "[37] A "reasonable likelihood of a more favorable result" arises when the error has so eroded a reviewing court's confidence in the outcome of a particular trial that the court believes a new trial is necessary.[38] Moreover, when the State violates its duty to disclose information, it bears the burden on appeal of persuading the court that the error did not unfairly prejudice the defendant.[39]

Defendant claims that the scabbard testimony was particularly damaging because further testimony revealed that Church's throat was superficially cut with a knife before he was killed. Hence, the jury could easily equate the knife wound with defendant and see him as the main instigator of the whole crime. The defense also claims that the image of defendant with a knife strapped to his hip falsely casts him in a bad light. The State responds that the curative order adequately advised the jury that it was the prosecution's position that Wood, not Archuleta, possessed the knife that inflicted the cut on Church's throat and actually cut him. The curative order, the State also notes, went beyond merely instructing the jury to disregard the information; it stated that Luce's testimony was not credible.

After weighing the arguments presented by the parties and reviewing the record, we believe that use of the scabbard testimony does not require reversal. First, the curative order more than adequately advised the jury about the inadmissibility

---

**33.** Utah R.Crim.P. 16(b).

**34.** *See State v. Knight*, 734 P.2d 913, 917 (Utah 1987) (citing *State v. Carter*, 707 P.2d 656, 662 (Utah 1985)).

**35.** Utah R.Crim.P. 16(g) (emphasis added).

**36.** *Knight*, 734 P.2d at 918; *see also* Utah R.Crim.P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded.").

**37.** *Knight*, 734 P.2d at 919 (emphasis in original) (quoting *State v. Fontana*, 680 P.2d 1042, 1048 (Utah 1984) (quoting *State v. Hutchison*, 655 P.2d 635, 637 (Utah 1982))).

**38.** *Id.* at 920; *see also State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992).

**39.** *Knight*, 734 P.2d at 921.

and questionable nature of the scabbard testimony. Second, even if the jury chose to believe, despite the curative order, that defendant was wearing a knife, there was no inference at trial that he actually used that knife on Church. Conversely, the prosecution presented evidence that *Wood,* not Archuleta, cut Church with a kitchen knife taken from the apartment where they both were living.

Moreover, the superficial cuts on Church's throat were minuscule when compared to the heinous torture and death he later suffered. The State presented plenty of reliable evidence supporting the jury verdict. We therefore do not consider the scabbard testimony to be so prejudicial as to undermine our confidence in the verdict,[40] and we conclude that there is no substantial likelihood that the outcome would have been different absent its admission.[41]

## VI. IMPROPER JURY INSTRUCTION

Defendant next challenges two jury instructions given by the trial court in the guilt phase of the trial.[42] He objects to written instruction 13 and also to a supplemental instruction given to the jury as a result of the jury's question relating to instruction 13.

We first address defendant's contention that instruction 13 incorrectly states the law. A challenge to a jury instruction as incorrectly stating the law presents a question of law. Whether an instruction correctly states the law is reviewable under a correction of error standard, with no particular deference given to the trial court's ruling.[43] Instruction 13 defines the phrase "in the commission of" set forth in Utah Code Ann. § 76–5–202(1)(d), under which defendant was charged.[44] The instruction given to the jury reads:

> The phrase "in the commission of" denotes a continuing chain of events. When there is close proximity in terms of time and distance between the aggravating circumstances and the homicide and there is no break in the chain of events from the inception of the aggravating circumstances to the homicide, the events are considered one continuous transaction.

Defendant claims that this instruction is incorrect because it failed to instruct the jury that if it found that any of the criminal acts inflicted on the victim were completed *before* the intent to commit the homicide was formed, then those offenses cannot be aggravating circumstances un-

---

**40.** *See Hamilton,* 827 P.2d at 240; *see also State v. Tillman,* 750 P.2d 546, 555–56 (Utah 1987) (finding errors to be insignificant in relation to the evidence presented).

**41.** Defendant's claim that the prosecution knowingly presented false testimony, or allowed false testimony to go uncorrected once it appeared, is equally unavailing. The trial court found that Luce's statement at trial was "new and different" from her earlier testimony but not necessarily false. The trial court also ruled that although the State used bad judgment by not immediately advising defendant about the new testimony, it did not act in bad faith and was not deceitful. Hence, defendant has failed to show that the testimony was false or that the prosecution knew it was false and used it anyway. *See Walker v. State,* 624 P.2d 687, 690–91 (Utah 1981).

**42.** Pursuant to Utah Code Ann. § 76–3–207, the guilt and sentencing phases for a person found guilty of a capital felony are bifurcated. Hence,

the sentencing authority, be it jury or judge, determines the appropriate sentence for capital murder in a separate proceeding only after it is first established that the defendant is guilty of the murder and that at least one statutory aggravating circumstance exists.

**43.** *Ramon v. Farr,* 770 P.2d 131, 133 (Utah 1989); *see also State v. Hansen,* 734 P.2d 421, 428 (Utah 1986).

**44.** Utah Code Ann. § 76–5–202(1)(d) states:

> (d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy ... or aggravated sexual assault, ... aggravated kidnapping, kidnapping, or child kidnapping.

der section 76–5–202(1)(d). We disagree. Instruction 13 was taken from our decision in *State v. Johnson*,[45] in which we adopted the definition of "while committing" given by the Indiana Supreme Court:

> [T]he phrase "while committing" denotes a continuing chain of events.... In other words, when there is a close proximity in terms of time and distance between the underlying felony and the homicide and there is no break in the chain of events from the inception of the felony to the time of the homicide, we treat the two events as part of one continuous transaction.[46]

Therefore, the important factor is whether the death and the aggravating acts constituted a "continuity of action over a span of time." [47] Section 76–5–202(1)(d) requires only that the defendant intentionally caused the death of the victim. It does not require that the defendant formulated the intent to kill the victim at the time each aggravating act was committed.

Our ruling in *Johnson* and the plain language of section 76–5–202(1)(d) lend ample support for use of instruction 13. We therefore find no error in its language and affirm the trial court's submission of the instruction to the jury.[48]

■ Defendant also questions the legal sufficiency of a supplemental instruction given to the jury. During deliberation to determine whether Church's death was caused while defendant was engaged, as a party, in the commission of or flight after committing the crime of object rape, the jury submitted the following question to the judge:

> Does the phrase ["in the commission of"] apply to only the homicide as stated in instruction 13 or to the committing [of] the crime of object rape—i.e., do we consider as [sic] separate events or part of one continuous event[?]

Evidently, the jury was having difficulty determining whether the homicide was committed "while in the commission of" object rape. In response to this question, the trial court formulated a supplemental instruction that stated, "You are instructed to consider the homicide and the object rape as separate events in the course of one continuing transaction as defined in Instruction No. 13." The jury later returned a verdict of guilty, including a finding that defendant was a party to the aggravating circumstance of object rape.

Defendant claims that the trial court's use of the language "you are instructed to consider" was a direct order to the jury and therefore usurped the jury's fact-finding role. That, in turn, violated his Sixth Amendment right to trial by jury. We agree that the instruction is nebulous and that the jury could have interpreted it as a mandate to find that the object rape and the murder were part of one continuing transaction. If that was the case, it amounts to an improper directed verdict on that aggravating circumstance. Hence, the trial court erred by not providing a proper instruction.

■ Having determined that the trial court's instruction was unclear enough to amount to error, our next consideration is what effect that error has on the verdict in this case. Although defendant generally objected to the use of instruction 13 at trial, he did not raise a proper objection concerning the supplemental instruction until this appeal.[49] A complaining party who fails to correctly object to an error at

---

**45.** 740 P.2d 1264, 1267 (Utah 1987).

**46.** *Id.* (citing *Stroud v. State*, 395 N.E.2d 770, 771 (Ind.1979)).

**47.** *Id.* at 1268.

**48.** We also note that evidence was presented at trial to support the jury's determination that the murder was committed while defendant was engaged in the commission of or flight after committing object rape, kidnapping, or aggravated kidnapping. Therefore, the trial court did not err by submitting the instruction to the jury.

**49.** Defendant did object at trial to the supplemental instruction but only insofar as it related to his objection to instruction 13. He did not claim that the supplemental instruction was unclear or that it amounted to a directed verdict.

trial is normally precluded from raising that issue on appeal.[50] However, in death penalty cases, this court will review errors raised for the first time on appeal although no proper objection was made at trial but will reverse only if the manifest and prejudicial error standard is met.[51] In addition, this court is free to notice manifest error apparent in the record and reverse if the error is prejudicial.[52]

In the instant case, it is difficult to determine whether the error is in fact plain. The trial court carefully considered its response to the jury's question and formulated a reply with the help and acquiescence of counsel from both sides. However, because of the serious and permanent consequences of a capital conviction, we find it necessary to carefully scrutinize the procedure below and resolve any ambiguity here in favor of defendant. Although neither party objected to the instruction, the language "you are instructed to consider," without additional language such as "whether" following it, did constitute error that should have been plain to the trial court.

We therefore proceed to determine whether the error affected defendant's substantial rights. This analysis entails a review of the error's effect on both the guilt and penalty phases of the trial. We begin with discussion of the guilt phase. Because the instruction concerning object rape was flawed, the jury's finding of the aggravating circumstance of object rape is invalid.[53]

Invalidation of one of the aggravating circumstances, however, does not affect the guilty verdict in this case. The jury also specifically and unanimously found that the murder was committed in connection with both kidnapping and aggravated kidnapping and was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner. The jury's finding of three other aggravating circumstances, when only one is necessary, is more than sufficient to support defendant's guilt conviction,[54] and we therefore find the error harmless at the guilt phase.

■ However, the issue is different when considering the death sentence imposed by the jury in the penalty phase. Before returning a death sentence, the sentencing authority, here the jury, must engage in a two-part analysis. First, the jury must consider the totality of the aggravating and mitigating factors and circumstances and be persuaded beyond a reasonable doubt that total aggravation outweighs or is more compelling than total mitigation.[55] Second, the jury must also be persuaded, beyond a reasonable doubt, that imposition of "the death penalty is justified and appropriate after considering all the circumstances."[56] The sentencing authority may consider as aggravating factors the nature and circumstances of the crime for which the defendant is charged, including the statutory aggravating circumstances found to exist, his or her character, background, and history, and any other relevant information.[57] Such evidence is admissible even if it would otherwise be excluded by the rules of evidence during the guilt phase

**50.** *State v. Tillman,* 750 P.2d 546, 551 (Utah 1987).

**51.** *Id.* at 553.

**52.** *Id.*

**53.** *See, e.g., State v. Carter,* 776 P.2d 886, 895 (Utah 1989); *see also Zant v. Stephens,* 462 U.S. 862, 867–69, 103 S.Ct. 2733, 2737–39, 77 L.Ed.2d 235 (1983) (discussing the invalidation of an aggravating circumstance for vagueness).

**54.** *See Carter,* 776 P.2d at 895 (citing *State v. Bishop,* 753 P.2d 439, 478–79 (Utah 1988)); *Johnson,* 740 P.2d at 1268; *State v. Shaffer,* 725 P.2d 1301, 1307 (Utah 1986).

**55.** *State v. Wood,* 648 P.2d 71, 83 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

**56.** *Id.*

**57.** Utah Code Ann. § 76–3–207(2) states:

(2) In these sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may

of the trial.[58] Mitigating factors that may be considered are enumerated in section 76–3–207(2).[59]

■■■ At defendant's penalty hearing, the jury considered, along with other factors, the aggravating circumstance of object rape that we have found to be invalid here. The issue is whether we must set aside defendant's death sentence because of the jury's consideration of the flawed circumstance. For the reasons discussed below, we conclude that invalidation of a statutory aggravating circumstance considered by the jury in sentencing does not require an automatic reversal of a defendant's death sentence, and we further hold that the invalidation here does not require reversal.

The United States Supreme Court recently addressed this precise issue in *Clemons v. Mississippi*.[60] In *Clemons*, the Supreme Court reviewed a decision of the Mississippi Supreme Court upholding the imposition of the death penalty in a case where one of the aggravating circumstances relied on in sentencing was invalid. The Supreme Court held that an appellate court that invalidates one or more aggravating circumstances found by the jury may still affirm imposition of the death penalty if the appellate court finds that one or more valid remaining aggravating factors outweigh the mitigating evidence.[61] The appellate court may make its finding by either reweighing the aggravating and mitigating circumstances or applying a harmless error review.[62]

This court discussed appellate review of a death sentence in *Andrews v. Morris*.[63] In *Andrews*, we declined to apply the two-part *Wood* standard retroactively to the death sentences imposed on defendants Andrews and Pierre.[64] However, we went on and made an independent, comprehensive review of the record and stated:

> We are able, on the basis of that evidence [defendant's trial record] to conclude with complete confidence that the use of the *Wood* standard in the penalty phase "could not possibly affect the bal-

---

58. *Id.*

59. *Id.*

60. 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

61. *Clemons*, 494 U.S. at 745, 110 S.Ct. at 1446; *see also Barclay v. Florida*, 463 U.S. 939, 958, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983) (affirming a similar decision of the Florida Supreme Court); *Zant*, 462 U.S. at 890, 103 S.Ct. at 2749 (affirming a similar case based on Georgia law); *People v. Davis*, 794 P.2d 159, 179–80 (Colo. 1990) (applying harmless error standard to use of an invalid aggravating circumstance in penalty phase), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991).

62. *Clemons*, 494 U.S. at 741, 110 S.Ct. at 1444. In *Clemons*, the Supreme Court vacated the judgment of the Mississippi Supreme Court because, from the appellate record, it was impossible to tell whether the state court had correctly applied the harmless error standard. *Id.* at 754, 110 S.Ct. at 1451.

63. 677 P.2d 81 (Utah 1983).

64. *Id.* at 95.

---

be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death. Aggravating circumstances shall include those as outlined in 76–5–202. Mitigating circumstances shall include the following:

(a) The defendant has no significant history of prior criminal activity;

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(c) The defendant acted under extreme duress or under the substantial domination of another person;

(d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his [or her] conduct or to conform his [or her] conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;

(e) The youth of the defendant at the time of the crime;

(f) The defendant was an accomplice in the murder committed by another person and his [or her] participation was relatively minor; and

(g) Any other fact in mitigation of the penalty.

ance [of the aggravating and mitigating factors]." There can be no reasonable doubt that, in petitioners' circumstances, the totality of the aggravating factors outweighed the totality of the mitigating factors and the imposition of the death penalty was appropriate.[65]

Hence, this court may apply a harmless error analysis to defendant's penalty hearing to determine if his substantial rights were affected by the jury's consideration of the invalid aggravating circumstance. In other words, we will determine if, absent consideration of the invalid aggravating circumstance of object rape, we can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate.

■■■ In doing so, we believe the record provides ample support for imposition of the death penalty even absent consideration of the aggravating circumstance of object rape. During the penalty hearing, the jury correctly considered the three other valid aggravators. The State also presented unrebutted testimony that defendant had been previously convicted of two felonies, theft of a firearm and arranging to distribute a controlled substance, and that he spent time in the Utah State Prison on two separate occasions for those offenses. Defendant was on parole for the drug offense at the time Church was murdered. The jury also heard testimony from a man incarcerated with Archuleta at the

Millard County jail. The inmate testified that defendant told him that Archuleta and Wood killed Church together and that defendant bragged that the killing was the "ultimate rush."

As mitigating factors, defendant presented testimony concerning his childhood, including the fact that his mother was sixteen when she gave birth to him. She was immediately placed in a reform school, leaving defendant to be raised by abusive grandparents. Defendant's adoptive parents, the Archuletas, testified that when they received defendant at age five, he carried several vestiges of that abuse, including cigarette burns and other burn scars on his body. Defendant also presented testimony from a psychologist who testified that he suffered from untreated attention deficit hyperactivity disorder, which can cause agitation, impulsiveness, and antisocial behavior.

Given the especially atrocious and depraved nature of the prolonged torture and eventual murder of Church and the relative lack of mitigating circumstances, we can confidently say beyond a reasonable doubt that even if the jury had not considered the invalid aggravator, it would have returned a verdict of death. Consequently, we hold that the totality of the aggravating factors outweighs the totality of the mitigating factors and that the imposition of the death penalty was justified and appropriate after considering all the circumstances.[66]

## VII. PROPORTIONALITY OF DEATH SENTENCE

Defendant raises two points on appeal concerning the proportionality of the death

---

**65.** *Id.* at 96; *see also State v. Lafferty,* 749 P.2d 1239, 1261 (Utah 1988) (any error in admitting evidence of defendant's prior violence in jail was harmless where existence of two other statutory aggravating factors was sufficient to outweigh mitigating factors beyond a reasonable doubt).

**66.** *See Andrews,* 677 P.2d at 96. Our holding that the improper instruction on the statutory aggravating circumstance of *object rape* was harmless beyond a reasonable doubt is bolstered by the fact that use of this aggravator did not permit the jury to consider improper evidence. As the Supreme Court noted in *Zant,* 462 U.S. at 888–89, 103 S.Ct. at 2748–49, if the evidence was admissible for purposes besides

establishing a statutory aggravator, then the "mere fact that [one] of the aggravating circumstances presented [was] improperly designated 'statutory' had an inconsequential impact on the jury's decision regarding the death penalty." *Id.* at 889, 103 S.Ct. at 2749 (citations omitted). Here, evidence of object rape was presented to the jury by the medical examiner, who testified that the puncture wounds in Church's liver from the tire iron were severe enough to cause death. Evidence of object rape could still be considered by the jury as an aggravating *factor,* as opposed to *circumstance,* at the penalty phase and could also be a factor contributing to the jury's finding that the murder was committed in an especially heinous, atrocious, cruel, or exceptionally

sentence in this case. First, he contends that Utah's death penalty statute is unconstitutional because it does not provide for case-by-case appellate review. Second, defendant claims that imposition of the death penalty here is not proportionate when compared with the sentence of his co-defendant, Wood, or with other capital cases in Utah.

■ Defendant's claim that this court should adopt a case-by-case analysis of a judge's or jury's decision to invoke the death penalty has been addressed and rejected in *State v. Holland* [67] and *State v. Tillman*. [68] We are not, at this juncture, prepared to adopt a policy of comparing the facts and circumstances of capital cases on a case-by-case basis. [69] We presently conduct a thorough review of death penalty cases, including a comprehensive review of the record, to determine whether the " 'sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate' " [70] and believe that our procedure is adequate to protect defendant's constitutional rights. [71]

■ Defendant's second point, that his sentence is disproportionate when compared to his co-defendant's and with other capital cases in Utah, is also unavailing. We note that Wood and Archuleta were originally charged with identical crimes associated with the murder. However, they were tried separately before different juries, were represented by different counsel, and had different aggravating and mitigating factors presented during their separate penalty hearings. As we previously stated, our review entails

> [f]ocus[ing] on the individual defendant and his [or her] acts ... not comparison with other criminals and their crimes. Each defendant is an individual, and each case is unique in its facts. Any attempt to draw broad comparisons between defendants or crimes calls for speculation as to why a particular defendant or crime was dealt with by that jury in that particular fashion. The many factors which may influence a jury's decision cannot be easily identified, let alone quantified. [72]

Hence, this court has declined to engage in a comparative proportionality review in death penalty cases, and we are unpersuaded of the necessity for doing so here. [73]

Defendant raises several other issues on appeal. After thoroughly reviewing those issues, we find them to be without merit. [74] The conviction for murder in the first degree and the imposition of the death penalty are therefore affirmed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., concurs in the result.

depraved manner. *See People v. Davis,* 794 P.2d at 180 n. 14.

**67.** 777 P.2d 1019, 1026 (Utah 1989).

**68.** 750 P.2d 546, 562 (Utah 1988).

**69.** *See Holland,* 777 P.2d at 1026.

**70.** *Id.* at 1025 (quoting *State v. Wood,* 648 P.2d 71, 77 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982)).

**71.** *See Tillman,* 750 P.2d at 562.

**72.** *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *see also State v. Parsons,* 781 P.2d 1275, 1281 (Utah 1989) (plurality opinion).

**73.** Defendant also claims that imposition of the death penalty is disproportionate in this case because only one person was killed. He relies on dicta in *State v. Holland,* 777 P.2d at 1026, in which we noted, "With few exceptions, juries in this state have not opted for death penalties when a defendant has committed only a single murder." That language cannot be construed as a mandate that a death sentence is disproportionate if there is only one victim. As a matter of fact, this court has affirmed imposition of the death penalty in several cases with only one victim. *See State v. Taylor,* 818 P.2d 1030 (Utah 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1576, 118 L.Ed.2d 219 (1992); *State v. Parsons,* 781 P.2d 1275 (Utah 1989).

**74.** *See State v. Carter,* 776 P.2d 886, 896 (Utah 1989).