**STATE of Utah, Plaintiff and Respondent,**

v.

**Robert JONES, Defendant and Appellant.**

**No. 890332–CA.**

Court of Appeals of Utah.

Nov. 21, 1989.

Robert L. Froerer, Ogden, for defendant and appellant.

R. Paul Van Dam and Sandra L. Sjogren, Salt Lake City, for plaintiff and respondent.

Before BENCH, GREENWOOD and BRYANT H. CROFT,[1] JJ.

## OPINION

GREENWOOD, Judge:

Defendant Robert Jones appeals his convictions of first degree murder, attempted second degree murder, and aggravated burglary in connection with the murder of Kim Chapman (Kim) and the shooting of Beverly Jones (Beverly). Defendant urges reversal of his conviction, claiming that he was denied effective counsel.

Defendant, who is not related to Beverly by blood or marriage, met her in 1979. They later began living together in a home Beverly purchased next door to defendant's parents. Their relationship deteriorated, and in October 1982, defendant moved out of Beverly's home and in with his parents next door.

In November 1982, Beverly began dating Kim. Beverly testified at trial that defendant frequently followed and threatened them. Once, the police were summoned when defendant confronted them at a bowling alley armed with, what appeared to Beverly to be, a pistol. Beverly also testified that on February 16, 1983, defendant entered her home and held her at gunpoint. According to Beverly, defendant told her that he would wait for Kim to arrive to blow his head off. Beverly managed to telephone Kim who then called the police. Defendant was charged criminally as a result, and a hearing was set for the week after March 11, 1983. Following this incident, Beverly stayed in the basement of Kim's parents' home at night. In March 1983, just prior to the shooting, defendant offered a friend $5,000 to assist him in killing Kim and asked another acquaintance to help him disguise himself so Kim and Beverly would not recognize him when he went after them.

On the evening of March 11, 1983, defendant entered the Chapman home. Kim's parents, Earl and Eva Chapman were upstairs in bed, Beverly's children were in their beds in a basement bedroom, and Kim and Beverly were in the main room of the basement watching television. According to Beverly's testimony, defendant suddenly appeared from the basement hallway carrying a gun. He instructed her to tie Kim's hands with a rope and then with a cord, but she pretended to be unable to do so. At approximately twenty-inches distance, defendant then pointed the gun at Kim. When Kim reached out to touch defendant's arms, defendant fired the gun, striking Kim in the chest. Defendant then fired a series of shots at Beverly, striking her in the hand and right flank. Another shot struck Kim in the forehead. Defendant then fled the scene.

Although defendant did not testify at trial, his counsel claimed that defendant did not enter the Chapman home intending to shoot Kim and Beverly, but to convince Beverly to leave Kim and go away with him. Allegedly, a struggle broke out during which defendant, in self-defense or by accident, shot Kim and Beverly.

Immediately following the shooting, Earl Chapman and Eva Chapman went down to the basement. After surveying the scene, they went upstairs, called the police, and waited for help. Neither the Chapmans nor the police found a gun in the basement.

Later that night, defendant appeared at the home of an off-duty sheriff's deputy and said he thought he had just killed someone. Months later, in the early part of the summer of 1983, defendant told a police officer, who was transporting defendant, that he killed Kim.

The jury convicted defendant of first degree murder for the killing of Kim, attempted first degree murder for the shooting of Beverly, and aggravated burglary. On appeal, the Utah Supreme Court reversed defendant's conviction and remanded the case for a new trial for reasons unrelated to this appeal.[2] After a second trial, the jury found defendant guilty of first degree murder, attempted second degree murder, and aggravated burglary.

---

1. Bryant H. Croft, Senior district judge sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (Supp.1989).

2. *State v. Jones,* 734 P.2d 473 (Utah 1987).

Following a hearing, the district court denied defendant's motion for a new trial on the ground that trial counsel was ineffective.

On appeal, defendant claims he was denied effective assistance of counsel and cites five specific instances where his counsel's conduct was assertedly prejudicial: (1) failure to pursue a theory regarding chain of custody of the murder weapon; (2) failure to present evidence of defendant's alleged mental illness; (3) lack of consultation and misleading statements by counsel to defendant; (4) calling only three witnesses out of the twenty-three who were subpoenaed; and (5) failure to adequately cross-examine witnesses.

## INEFFECTIVENESS OF COUNSEL

The Utah Supreme Court has adopted the United States Supreme Court standard in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for determining the existence of ineffective assistance of counsel at trial. *State v. Gardner*, 101 Utah Adv.Rep. 3, 12 (1989); *State v. Carter*, 776 P.2d 886, 893 (Utah 1989); *State v. Verde*, 770 P.2d 116, 118–19 n. 2 (Utah 1989). To establish ineffectiveness of counsel under the *Strickland* standard, "a defendant must show, first, that his or her counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment, and, second, that counsel's performance prejudiced the defendant." *Carter*, 776 P.2d at 893. Further, "[o]n appeal, defendant must overcome the strong presumption that his counsel's assistance was adequate," *State v. Moritzsky*, 771 P.2d 688, 690 (Utah Ct.App.1989), and "exercised reasonable professional judgment." *State v. Bullock*, 119 Utah Adv.Rep. 33, 36 (1989). *See also Strickland*, 466 U.S. at 690, 104 S.Ct. 2066; at *State v. Frame*, 723 P.2d 401, 405 (Utah 1986).

## 1. CHAIN OF CUSTODY OF GUN

We first examine defendant's claim that counsel's failure to pursue evidence concerning the chain of custody of the murder weapon, constituted ineffectiveness of counsel. With regard to custody of the murder weapon, defense counsel had access to the following information: (1) although defendant had purchased two .38 caliber guns, one of which he gave to Beverly, and had been given another .38 caliber gun by Roger Birt prior to the shooting, none of these three guns were used in the shooting; (2) Officer Norm Soaki of the Ogden City Police Department, obtained a .38 caliber gun from a pawn shop that ballistics tests and Chris Singleton identified as the weapon that shot Kim and Beverly; (3) Harvey Blamey, the registered owner of the gun used in the shooting, purchased the gun prior to the shooting from a pawn shop in Ogden and the same day gave the gun to Renold Hastie; (4) Hastie and Norwood Fridal used the gun in a series of armed robberies prior to and after the shooting; (5) Hastie sold the gun to Chris Singleton, who then gave the gun to Mike McDill, who, at Singleton's request, pawned the gun; (6) Hastie and Fridal denied having known defendant at the time of the shooting; (7) Soaki testified at the first trial, that he was unable to connect Singleton, Hastie or Fridal to defendant; (8) defendant's father told counsel, John Caine and Maurice Richards, who represented defendant during the first trial, that Beverly was connected to some of the people involved in the custody chain; (9) in his motion for a new trial, defendant alleged that Chris Norvall, his ex-wife, was somehow connected to Hastie and Fridal and had a social relationship with Beverly; (10) in an evidentiary hearing after the first trial, Caine and Richards admitted they were unable to connect Hastie or Fridal to Beverly; (11) in the same evidentiary hearing, Soaki testified he was unable to connect Singleton, Hastie, or Fridal to Beverly; (12) an affidavit of Soaki states that defendant's sister, Le Ann Carter, personally led Soaki to Hastie's house and told Soaki that the resident of the house was a good friend of defendant and might have the gun; and (13) counsel for the State testified that there were rumors that defendant was a

"wheelman" for the robberies committed by Hastie and Fridal.

Defendant claims he was unarmed when he entered the Chapman house. He hypothesizes that Beverly had brought the gun into the Chapman basement. According to defendant, Beverly obtained the gun from defendant's ex-wife, Chris Norvall, who defendant alleges is linked with Fridal and Hastie. Defendant conjectures that immediately following the shooting, Beverly, although wounded, retrieved the gun and hid it. She then enlisted the help of an accomplice who retrieved the gun from the Chapman basement and returned it to Norvall who then returned it to Fridal and Hastie.

In the second trial, counsel did not pursue the gun custody issue. A ballistics expert testified regarding the bullets fired from the murder weapon, but made no mention of which gun fired the bullets. The only reference made to the identification of a gun during trial was the testimony of Roger Birt. Birt testified that he and defendant, shortly before the shooting, practiced shooting with the .38 caliber gun that he had purchased for defendant.

Defendant asserts that counsel's performance was markedly deficient because counsel failed to tell the jury that the weapon Birt referred to was not the gun used in the shooting and failed to probe the gun's custody chain. Probing the gun custody issue would have, according to defendant, supported his claim that he was unarmed when he · entered the Chapman home. Defendant contends that proving he was unarmed when he entered the Chapman home would have corroborated his claim that he entered the home solely to talk with Beverly, thereby negating the applicable intent elements of the aggravated burglary,[3] first degree murder[4] and attempted second degree murder,[5] charges of which he was convicted.[6]

### a. COUNSEL'S PERFORMANCE

When assessing counsel's performance, we will not second guess trial counsel's legitimate use of judgment as to trial strategy. *Codianna v. Morris*, 660 P.2d 1101, 1110 (Utah 1983); *State v. Wight*, 765 P.2d 12, 15 (Utah Ct.App.1988). "Trial tactics lie within the prerogative of counsel and may not be dictated by his [or her] client. Decisions as to what ... defenses to interpose are generally left to the professional judgment of counsel." *Carter*, 776 P.2d at 894 n. 31 (quoting *State v. Wood*, 648 P.2d 71, 91 (Utah 1982), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

---

**3.** Utah Code Ann. § 76-6-202 (1978) states in pertinent part:

(1) A person is guilty of burglary if he enters or remains unlawfully in a building or any portion of a building with intent to commit a felony or theft or commit an assault on any person.

**4.** Utah Code Ann. § 76-5-202 (Supp.1989) states in pertinent part:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:
. . . .
(c) The actor knowingly created a great risk of death to a person other than the victim and the actor.
(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit ... aggravated burglary, burglary....

**5.** Utah Code Ann. § 76-5-203 (Supp.1989) states in pertinent part:

(1) Criminal homicide constitutes murder in the second degree if the actor:

(a) intentionally or knowingly causes the death of another;
(b) intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another....
(c) acting under circumstances evidencing a depraved indifference to human life, he engages in conduct which creates a grave risk of death to another and thereby causes the death of another....

**6.** In his brief, defendant also argues that Beverly's alleged invitation to him to visit her at the Chapman home negated the element of burglary requiring an unlawful entry, *see* section 76-6-202(1), and further supported his claim that his sole intent was to see Beverly. Although in the first trial, defendant testified that Beverly invited him to the Chapman home and told him where to find the key, defendant mistakenly states that this point was made in the second trial. We find nowhere in the record where this fact was presented to the jury.

Counsel's decision to avoid pursuing the chain of custody issue was a reasonable trial strategy. Attempting to show that defendant was incapable of intentionally or knowingly shooting Kim and Beverly, counsel wanted to portray a lovesick and cowardly defendant with only one problem in life: his affection for Beverly. Probing the custody issue would have required an in-depth cross examination of Officer Soaki and disclosure of defendant's alleged connection with armed robbers, thus weakening defendant's position.

The soundness of counsel's judgment is substantiated by the determination of defendant's counsel in the first trial, Caine and Richards, to also avoid pursuing the custody issue. At trial, they elicited a statement from Officer Soaki that he could not tie the murder weapon to defendant and then they promptly terminated the cross-examination. During the evidentiary hearing that followed the trial, they testified that they avoided the custody issue to prevent Soaki from connecting defendant to Hastie and Fridal. Counsel for the State, on the other hand, testified that they hoped Caine and Richards would pursue the custody issue so they could present information to the jury connecting defendant to Hastie and Fridal.

Admittedly, important distinctions exist between the first and second trials. First, because the death penalty was not imposed in the first trial, it was a nonfactor in the second trial. Caine and Richards admitted they were trying in the first trial, to present defendant in the most positive light to avoid the death penalty. Second, Caine and Richards inaccurately assumed that the murder weapon was one of the two .38 caliber guns defendant had purchased. In the second trial, counsel knew the actual identity of the murder weapon. Third, Caine and Richards were unaware of Blamey and McDill's involvement in the chain of custody and of Singleton's identifying

the gun as the murder weapon prior to the ballistics tests. These facts were known to counsel in the second trial.

These differences, however, did not necessitate a change in strategy in the second trial. Caine and Richards testified that although the additional information would have corroborated defendant's story that he did not take the gun to the house, they had serious reservations about the wisdom of pursuing the custody issue because of the danger of linking defendant with Hastie and Fridal. Further, even though counsel was not faced with the possibility of a death penalty in the second trial, they still wanted to convince the jury that defendant was simply an unarmed heartbroken intruder, who lacked the courage and requisite intent or knowledge to commit the crimes. Linking defendant to Hastie and Fridal could have tarnished their portrayal of defendant. "Whenever there is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel." *Bullock*, 119 Utah Adv.Rep. at 36.

We find that defendant has not sufficiently shown that the decision made by trial counsel to eschew the chain of custody theory was not merely tactical choices or that counsel's performance in this regard falls below an objective standard of reasonable professional judgment.

### b. PREJUDICE

To demonstrate that counsel's performance prejudiced him, defendant has the burden to "affirmatively show that a reasonable probability exists that except for ineffective counsel, the result would have been different." [7] *Verde*, 770 P.2d at 119 n. 2. (quoting *State v. Lovell*, 758 P.2d 909, 913 (Utah 1988)). We find it highly unlikely that the result would have been different had counsel pursued the custody issue. Al-

---

**7.** This court may consider the two issues of (1) whether the conduct of counsel was below the specified standard and (2) whether the conduct prejudiced defendant in what ever order seems appropriate, *State v. Carter*, 776 P.2d 886, 893 n. 27 (Utah 1989), and in some cases, resolution of

one issue may obviate the need to deal with the other. In this case, however, we believe the issue of prejudice relative to the gun custody issue was sufficiently problematic to merit analysis.

though proving that he was unarmed when he entered the Chapman home may have bolstered his defense that he lacked the requisite intent to shoot Kim and Beverly, we are struck by the improbability of defendant's theory that Beverly hid the gun after being shot. Several witnesses, including Kim Chapman's parents and police officers, testified that there was no gun at the scene after defendant left. Save his own opinion that Beverly was somehow connected to Chris Norvall, Hastie, and Fridal, defendant offers no evidence to support his theory.

Furthermore, the evidence presented at trial overwhelmingly indicates that defendant intended to seriously harm Kim and Beverly. Defendant twice admitted that he shot Kim and Beverly; he previously threatened to kill them both; he approached others to help him carry out his murder plans; he purchased a gun and practiced shooting prior to the shooting; and he was facing criminal charges for previously assaulting Beverly in her home.

We find it improbable that the jury would have decided differently if the gun custody issue had been pursued. We, therefore, hold that defendant, by inadequately showing prejudice and deficiency of performance by counsel under the *Strickland* test, fails to overcome the strong presumption of effective counsel.

## 2. OTHER ALLEGED DEFICIENCIES

Following a thorough review of the record and briefs before us, we find that the remaining allegations of deficient performance that defendant argues constitute ineffective counsel, are without merit. Generally, the conduct cited by defendant consists of legitimate trial strategy [8] or resulted in no prejudice to defendant. Recognizing that we "need not analyze and address in writing each and every argument, issue, or claim raised properly before us on appeal," *Carter*, 776 P.2d at 888, we

decline to detail our analysis of the remaining four deficiencies. To address them would amount to unnecessary verbiage and a redundant literary exercise. *Id.* at 889. We state, simply, that defendant fails to demonstrate that the remaining deficiencies show that his counsel rendered a deficient performance below an objective standard of reasonable professional judgment and that counsel's performance prejudiced the defendant.

Affirmed.

BENCH and BRYANT H. CROFT, JJ., concur.

---

8. For example, defendant claims his counsel should have argued he was incompetent to stand trial or lacked the capacity to form the requisite intent to commit the crimes. Testimony at defendant's sentencing hearing, however, by Dr. Alma Carlisle, a Utah State Prison psychologist, negated those theories. Exclusion of the theories was, therefore, a legitimate trial strategy.