STATE of Utah, Plaintiff and Appellee,

v.

Clifford W. PERRY, Defendant
and Appellant.

No. 940728–CA.

Court of Appeals of Utah.

July 13, 1995.

Rehearing Denied Aug. 14, 1995.

Mary C. Corporon, Salt Lake City, for appellant.

Marian Decker and Jan Graham, Salt Lake City, for appellee.

Before ORME, BENCH, and BILLINGS, JJ.

## OPINION

BILLINGS, Judge:

Clifford W. Perry appeals his aggravated kidnapping conviction, a first degree felony in violation of Utah Code Ann. § 76–5–302 (1995). We affirm.

## FACTS

At approximately 12:00 midnight on September 21, 1993, the victim stopped at a local Smith's grocery store. She parked her car four to five feet from a large light in the parking lot and entered the store. As she returned to her vehicle, she noticed that a late-model, yellow Cadillac had parked directly in front of her vehicle. She also noticed a man, whom she later identified as defendant, walking between the two cars toward the store. She next noticed he was walking up behind her. The man grabbed the victim around the neck. He informed her that he had a knife and, holding the blade to her throat, ordered her to get into her car.

As the victim entered the vehicle, she could see her assailant's lower body and noticed that he was not wearing any shoes, only a pair of white socks. The assailant ordered her to "slide over" to the passenger seat, and he then entered the vehicle. As the assailant climbed into the car, the victim was able to observe his profile, noting that he had blonde hair that was "really curly and kinda messed up, like he hadn't combed it." The victim could not recall whether the dome light in her car was on when the assailant entered the vehicle, but testified that it always came on when the door was opened and that it was operating properly both prior to and after the incident.

Once the assailant was inside the vehicle, the victim saw the knife, which she described

as having a two- to three-inch blade. Her assailant continued to hold the knife in his right hand as he grasped the steering wheel. He demanded, and she handed him, the keys. At this time, the victim again looked directly at the assailant, gaining a three-quarter view of his face. She claimed that although the vehicle's interior was "kind of shadowy, the parking lot light shone through the windshield."

The victim inquired where he was taking her, and apparently referring to the music on the radio, the assailant replied that she had "good taste in music." He then asked the victim where the car lights were located and turned them on. As he began to back out of the parking space, the victim opened the passenger side door and "tried to jump from the car." The assailant grabbed her by the hair, yanking on her ponytail and pulling out several strands. He ordered her to get back in the car, but she pulled away. The victim testified that her assailant confined her in the vehicle for approximately four minutes before she was able to escape.

The victim ran toward another customer, who was loading his groceries into a pickup truck approximately forty to fifty feet away. The customer testified that he observed the victim's escape. The victim told the customer that the man in the car was trying to kidnap her and that he had held a knife to her throat. The victim and the customer observed the assailant get out of her car and run toward the Cadillac. The customer then ran into the store to call the police.

Steve McGregor also witnessed the incident. McGregor was waiting outside in a van while his co-worker entered the store. McGregor observed the victim exit the store. McGregor's attention was next drawn to the victim when he heard her scream and saw her run toward the customer. McGregor ran toward the yellow Cadillac as it backed away from him, then he and his co-worker jumped into their van and followed the Cadillac. The two men never lost sight of the car as it exited the parking lot and proceeded south on 900 East. The van came within two to three feet of the Cadillac and they were able to get the license plate number.

The police arrived at the store approximately five to ten minutes after the incident. The victim described the assailant to an officer. She stated the assailant was a white male in his mid-thirties, that he was approximately 5'6" to 5'7" tall and weighed approximately 150 pounds. She also described him as being clean shaven and noted that his hair was collar length, curly, and blonde. She told the officer that she was not certain about the color of the assailant's shirt or pants but noted he was shoeless and wore white socks.

The police ran a registration check on the license plate number and found that the Cadillac was registered to defendant's girlfriend. Several officers went to her home at approximately 1:00 a.m., where they observed the yellow Cadillac parked outside. The officers knocked on the door and defendant answered. The officers noted that defendant substantially matched the witnesses' physical descriptions of the assailant.

With defendant's permission, the police entered his living room, where they observed several items spread out on the coffee table, including a pocket knife with an approximate two-inch blade. The officers also observed defendant's shoes and socks and noted that defendant's white socks were soiled on the bottom. Defendant told the police that he had been at a bar earlier that evening and that he had been the only person driving the Cadillac that night.

An officer brought the victim to defendant's apartment and told her that "he was going to ask [her] to identify the person that was there." The victim was seated in the front seat of the patrol car when the officer drove the vehicle onto the lawn so that the car lights shone on defendant, who was standing on the front porch. There was one officer standing to the left of defendant and a couple more officers standing to the right. The officer asked the victim if the man standing on the porch was her assailant. The victim thought he looked like the assailant, but asked the officer to pull closer. The officer then pulled the car within forty feet of defendant's porch. The victim observed defendant for an additional thirty seconds and positively identified him as her assailant.

Defendant was thereafter arrested and charged with aggravated kidnapping. At the time of his arrest, defendant was 5'9" tall, weighed 170 pounds, and had collar-length blonde hair and a slight blonde mustache.

Prior to trial, defendant filed a motion to suppress the victim's eyewitness identification as unreliable. Following an evidentiary hearing, the trial court denied the motion.

At trial, defendant continued to challenge the reliability of the victim's identification. A jury found defendant guilty of aggravated kidnapping and the trial court sentenced him to a fifteen-year minimum mandatory term pursuant to Utah Code Ann. § 76–3–201 (1995). Defendant's current counsel filed motions for a new trial, alleging that defendant's trial counsel had provided ineffective assistance of counsel and that the jury's verdict was not supported by sufficient evidence. The trial court denied both motions. Defendant appeals.

On appeal, defendant argues the trial court erred in: (1) denying his motion to suppress the victim's pre-arrest identification of him as unconstitutionally unreliable; (2) denying his motion for a new trial because he received ineffective assistance of counsel and because the prosecution did not establish the elements of aggravated kidnapping; and (3) sentencing defendant to a fifteen-year minimum mandatory term.[1]

### SHOW UP IDENTIFICATION

Defendant contends the trial court erred in denying his motion to suppress the victim's pretrial identification. He argues that the identification was unreliable such that it violated his right to due process under the Fourteenth Amendment to the United States Constitution and Article 1, Section 7 of the Utah Constitution.

"The constitutionality of an identification procedure is a mixed question of law and fact." *State v. Mincy*, 838 P.2d 648, 657 (Utah App.) (citing *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71

L.Ed.2d 480 (1982)), *cert. denied,* 843 P.2d 1042 (Utah 1992); *accord State v. Ramirez,* 817 P.2d 774, 781 (Utah 1991).

The Utah Supreme Court recently articulated a new analytical model for the standard of review to be used in evaluating the application of law to a particular set of facts in *State v. Pena,* 869 P.2d 932 (Utah 1994). The court in *Pena* likened the trial court's discretion in such instances to a fenced pasture:

> To the extent that a trial judge's pasture is small because he or she is fenced in closely by the appellate courts and given little room to roam in applying a stated legal principle to the facts, the operative standard of review approximates what can be described as "de novo." That is, the appellate court closely and regularly redetermines the legal effect of specific facts. But to the extent that the pasture is large, the trial judge has considerable freedom in applying a legal principle to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse—in effect, creating the freedom to be wrong without incurring reversal. Only when the trial court judge crosses an existing fence or when the appellate court feels comfortable in more closely defining the law by fencing off a part of the pasture previously available does the trial judge's decision exceed the broad discretion granted.

*Id.* at 937–38.

The court cited a number of reasons for granting trial judges discretion when applying law to fact:

> (i) when the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out; (ii) when the situation to which the legal principle to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative; and (iii) when the trial judge

---

1. The State filed a motion to strike portions of defendant's reply brief. We grant the State's motion with respect to the police report contained therein, as this was not part of the record below. We therefore do not consider any arguments relying on this document, but otherwise consider the material in the reply brief to resolve this appeal.

has observed "facts," such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts.

*Id.* at 939 (citing Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 662–63 (1971)).

▮▮▮▮ We hold, under *Pena*, that trial courts have a measure of discretion to determine whether eyewitness identifications are reliable. Consistent with *Pena*, the reliability of the eyewitness identification, like the "reasonable-suspicion legal standard is one that conveys a measure of discretion to the trial judge when applying that standard to a given set of facts.... On the other hand, a sufficiently careful review is necessary to assure that the purposes of the [reliability of eyewitness identifications] are served." *Id.* at 939. As in *Pena*, the reason to characterize our review as less than de novo is that the question of whether an eyewitness identification is reliable under the totality of the circumstances is "highly fact dependant, and the fact patterns are quite variable." *Id.* at 940.

▮▮▮▮ In *Ramirez*, the Utah Supreme Court determined that the due process analysis under Article 1, Section 7 of the Utah Constitution for determining the reliability of eyewitness identifications "is certainly as stringent as, if not more stringent than, the federal analysis." 817 P.2d at 784. Therefore, we, like the supreme court in *Ramirez*, do not undertake a separate analysis under the Fourteenth Amendment of the United States Constitution. We note, however, our conclusion would be no different under a Fourteenth Amendment analysis.

Under the Utah due process analysis, " '[t]he ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable.' " *Mincy*, 838 P.2d at 658 (quoting *Ramirez*, 817 P.2d at 781). The court must consider the following factors in making this determination:

"(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly."

*Ramirez*, 817 P.2d at 781 (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)).

Defendant does not challenge the trial court's underlying factual findings and we therefore accept them. Rather, defendant challenges the trial court's ultimate *Ramirez* findings that the victim had an opportunity to view the assailant during the incident and that her degree of attention to him was sufficient to identify him. Defendant also challenges the consistency of the victim's identification and claims it was the product of improper suggestion.

With respect to the trial court's finding on the first *Ramirez* factor, the victim's opportunity to view the assailant during the event, defendant argues the incident occurred late at night in a sparsely lit parking lot, and thus the victim did not have an adequate opportunity to view the assailant. Pertinent circumstances with respect to this factor include:

the length of time the witness viewed the actor; the distance between the witness and the actor; whether the witness could view the actor's face; the lighting or lack of it; whether there were distracting noises or activity during the observation; and any other circumstances affecting the witness's opportunity to observe the actor.

*Id.* at 782.

In the present case, the victim was confined to the vehicle for approximately four minutes before she was able to escape. During that time, she spent approximately twenty seconds looking directly at the assailant's profile or a three-quarter view of his face. The trial court found that the victim made these observations from a distance of two feet. The victim testified that the dome light in her car likely illuminated the assailant as he entered the vehicle and that the parking

lot light shone through the windshield. Moreover, the victim had an opportunity to view the assailant outside the car /as he fled after her escape. The record is devoid of any evidence of distractions affecting the victim's ability to observe the assailant. Based upon these facts in the record, we affirm the trial court's finding that the victim had sufficient opportunity to observe her assailant.[2]

With respect to the trial court's finding on the second reliability factor, the victim's degree of attention to the assailant, defendant contends the victim was too distracted by the knife the assailant held in his hand to observe the assailant. However, the victim testified, and the trial court found, that at the time she observed the assailant, she did so "with some thought of being able to later identify him." The victim testified that she had received crime prevention training in her work as a night manager at a local pizza store and that she looked directly at the assailant with the specific purpose of being able to later identify him. Likewise, the trial court found that the victim was not so unduly excited by the incident that she could not pay adequate attention to the assailant. Again, we cannot say these findings regarding the attention the victim paid to her assailant were clearly erroneous.

Regarding the fourth reliability factor, whether the victim's identification was made spontaneously and remained consistent[3] thereafter or whether it was the product of undue suggestion, the following circumstances are relevant:

> [T]he length of time that passed between the witness's observation at the time of the event and the identification of defendant; the witness's mental capacity and state of mind at the time of the identification; the witness's exposure to opinions, descriptions, identifications, or other information from other sources; instances when the witness or other eyewitnesses to the event failed to identify defendant; instances when the witness or other eyewitnesses gave a description of the actor that is consistent with defendant; and the circumstances under which defendant was presented to the witness for identification.

*Id.* at 783.[4]

The trial court's findings clearly establish that the victim consistently described the assailant's hair as blonde, curly, unkempt, and approximately collar length. When trial counsel asked the victim why the officer's report indicated that she had described the assailant as having shoulder-length hair, the victim responded that she recalled telling the officer that his hair was collar length only. The trial court found that any inconsistencies between the victim's description and defendant's actual appearance were minor, finding that defendant's moustache was quite blonde and particularly slight, and that her failure to observe it was therefore not surprising. Finally, while none of the other witnesses identified defendant as the assailant at a police

---

2. In pertinent part, the underlying findings of fact supporting the trial court's ultimate finding that the victim had an opportunity to view the assailant during the event are as follows:

> 15. That while in her automobile with the male who had the knife, [the victim] was sitting within two feet of that male.
> 16. That [the victim's] automobile was sufficiently lighted for her to see the male's features.
> . . . .
> 18. That [the victim] observed the male from profile and three-quarters view.
> 19. That [the victim] observed the male for a total period of ten to twenty seconds while the former was in her automobile.
> . . . .
> 23. That [the victim] was seated in her automobile with the male for at least one minute.
> . . . .

> 47. That [the victim] had sufficient prior opportunity to observe and identify defendant independent of the "show up" identification.

3. In pertinent part, the underlying finding of fact supporting the trial court's ultimate finding that the victim's identification remained consistent is as follows:

> 46. That there were only minor inconsistencies in the way [the victim] described the male while she was still at the Smith's Food King parking lot and the actual description of defendant as he appeared at the "show up."

4. The fifth and final *Ramirez* factor is the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991). In the instant case, the victim's account of the incident was uncontroverted by the testimony of the other witnesses who were in the parking lot that night.

lineup two months after the incident, the description of the assailant given by these witnesses substantially matched that given by the victim. Thus, we agree with the trial court that the consistency element was satisfied.

However, we agree with defendant that the trial court's finding that there was nothing blatantly suggestive or prejudicial in the manner in which the show up was conducted is clearly erroneous. Immediately after the commission of the crime, the victim was informed by an officer that the police had apprehended the registered owner of the car that she had seen that night and that he matched her description of the assailant. She was then brought to defendant's home, where she was shown defendant standing on his front porch, illuminated by the headlights from a police vehicle and surrounded by several police officers.

Although we conclude the show up was unduly suggestive, that conclusion does not end our inquiry. The ultimate question remains to be determined, namely, whether under the totality of the circumstances the identification was reliable. *Id.* at 781. In *Ramirez*, a factually analogous case, the supreme court, after having considered all the reliability factors, found, despite a blatantly suggestive show up, the trial court did not err by admitting the identification.[5] *Id.* at 784. The court stated: "Considering the facts in the light most favorable to the trial court's decision and giving due deference to the trial judge's ability to appraise demeanor evidence, we cannot say that [the victim's] testimony is legally insufficient when considered in light of the other circumstances to warrant a preliminary finding of reliability and, therefore, admissibility." *Id.*

Under the "totality of the circumstances in the present case," *id.* at 781; *Mincy,* 838 P.2d at 658, and under the broad discretion and less than de novo *Pena* standard of review, we affirm the trial court's conclusion that the eyewitness identification was reliable.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ Defendant next contends the trial court erred by denying his motion for a new trial on the basis that he received ineffective assistance of counsel. Defendant argues that trial counsel was ineffective in that he failed to investigate potential alibi witnesses and failed to request a jury instruction for the lesser included offense of aggravated assault. In a situation such as this, in which the trial court has previously held an evidentiary hearing on a motion based on ineffective assistance of counsel, such a claim presents a mixed question of law and fact. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Fernandez v. Cook,* 870 P.2d 870, 874 (Utah 1993). Accordingly, Utah's appellate courts have deferred to the trial court's findings of fact, but review its application of the appropriate legal principles to its factual findings for correctness. *State v. Hay,* 859 P.2d 1, 4–5 (Utah 1993).

■ However, in *State v. Pena,* 869 P.2d 932, 937–40 (Utah 1994),[6] the Utah Supreme Court established a spectrum of discretion given to a trial court in its application of legal principles to a specific set of facts. In *Pena*'s metaphorical pasture, certain legal issues "fence in" the trial court, allowing it "little room to roam in applying a stated

---

5. In *Ramirez,* the defendant was convicted of aggravated robbery. The incident occurred outside at about 1:00 a.m. The defendant wore a mask covering most of his face. The eyewitness was one of the victims, who was held at gun point and had only a few minutes to observe the defendant. Prior to the show up, the police had remarked that they had apprehended someone who fit the description of one of the robbers. The identification took place in the street in the middle of the night. The defendant, who had a dark complexion and long hair, was the only person at the show up who was not a police officer. He stood with his hands behind his back, handcuffed to a chain link fence. The defendant was illuminated by lights from police vehicles trained on him. Three witnesses viewed the defendant from the back seat of a police car. By focusing primarily on the defendant's eyes—the only part of the defendant's face that he was able to observe during the robbery—only one witness was able to positively identify the defendant. *Id.* at 784.

6. See *supra* pp. 1235–36 for a more detailed discussion of the *Pena* standard of review.

legal principle to facts," and thus are subject to a de novo appellate review. *Id.* at 937. On the other end of the spectrum, appellate review is more deferential to the trial court's decisions on issues such as a ruling on a motion for a new trial or on admission of evidence under Utah Rule of Evidence 403, thereby allowing the trial court more room to roam in its application of the law. *Id.* at 938. We conclude that ineffective assistance of counsel falls on the end of the spectrum subject to de novo review of the ultimate legal question of whether the defendant has received ineffective assistance of counsel in violation of the Sixth Amendment.[7]

█ *Strickland* established a firm two-pronged test which must be applied to the facts relevant to the issue of ineffective assistance of counsel. Utah appellate courts have consistently followed this framework. *See Fernandez,* 870 P.2d at 874; *Hay,* 859 P.2d at 4–5; *State v. Hallett,* 856 P.2d 1060, 1062–63 (Utah 1993); *Tillman v. Cook,* 855 P.2d 211, 221–22 (Utah 1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 706, 126 L.Ed.2d 671 (1994); *State v. Tyler,* 850 P.2d 1250, 1253–54 (Utah 1993); *State v. Templin,* 805 P.2d 182, 186 (Utah 1990); *State v. Verde,* 770 P.2d 116, 118–19 n. 2 (Utah 1989); *State v. Tennyson,* 850 P.2d 461, 465–66 (Utah App.1993); *State v. Ellifritz,* 835 P.2d 170, 174 (Utah App.1992); *State v. Jones,* 783 P.2d 560, 562–64 (Utah App.1989), *aff'd,* 808 P.2d 1056 (Utah 1991); *State v. Crestani,* 771 P.2d 1085, 1089–90 (Utah App.1989). Under this analysis, the defendant must overcome the strong presumption that counsel's performance was "within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. To that end, a reviewing court defers to counsel's choices regarding trial strategy, even if in hindsight his or her choices were incorrect. *Id.; Tennyson,* 850 P.2d at 465. In the face of such broad deference to *trial counsel's* tactical decisions there is simply no room for

a less than de novo review of the *trial court's* determination of whether counsel's performance satisfied the Sixth Amendment. Otherwise, no consistency will exist in this important arena.

█ Perhaps more importantly, *Pena* specifically limited trial court discretion in cases involving fundamental constitutional rights. *Pena* states:

> [T]here are countervailing policy reasons for not granting broad discretion to a trial court. For example in *Thurman,* we found that while there were varying fact patterns that would be relevant to determinations of voluntariness of consent, they were not so unmanageable in their variety as to outweigh the interest in having uniform legal rules regarding consent to search, given the substantial Fourth Amendment interests lost as a result of such consents.

869 P.2d at 939 (citing *State v. Thurman,* 846 P.2d 1256, 1271 (Utah 1993)). Ineffective assistance of counsel involves precisely this type of basic constitutional issue. The Sixth Amendment right to counsel is essential to protect the fundamental right to a fair trial, the linchpin of our judicial system, and thus "plays a crucial role in the adversarial system." *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063.

For these reasons, we review the trial court's application of the law to the facts pertinent to a claim of ineffective assistance of counsel nondeferentially for correctness.

█ In order to bring a successful ineffectiveness claim, a defendant must show that trial counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and that the deficient performance prejudiced the outcome of the trial. *Id.* at 687, 104 S.Ct. at 2064. Defendant contends that by failing to adequately follow up the information he gave counsel regarding a potential alibi and to look for the alibi

---

7. Moreover, subsequent to its opinion in *Pena,* Utah Supreme Court decisions on ineffective assistance of counsel have applied the legal principles as set forth in *Strickland,* but have shown no deference to whatever action the trial court took in its application of the law. *See State v. Lopez,* 886 P.2d 1105, 1113–14 (Utah 1994); *State v.*

*Goddard,* 871 P.2d 540, 545–46 (Utah 1994). Recent opinions of this court have followed a similar course. *See State v. Strain,* 885 P.2d 810, 814 (Utah App.1994); *State v. Harry,* 873 P.2d 1149, 1154 (Utah App.1994); *State v. Cosey,* 873 P.2d 1177, 1179–80 (Utah App.), *cert. denied,* 883 P.2d 1359 (Utah 1994).

witnesses, trial counsel failed to present potentially exculpatory evidence at trial. Trial counsel's decision regarding the proper allocation of pretrial resources is normally a tactical decision, which this court will not overturn absent a showing of unreasonableness or prejudice. *E.g., Tyler,* 850 P.2d at 1255; *State v. Strain,* 885 P.2d 810, 818 (Utah App.1994).[8]

■■■ At the evidentiary hearing on defendant's motion for a new trial on his ineffective assistance of counsel claim, trial counsel affirmed that defendant told him that he had been drinking at a local bar that night, but that defendant indicated that he left the bar around 11:45 p.m., which would have allowed him ample time to commit the offense. Counsel testified that, with the assistance of an investigator, he nevertheless attempted to contact the purported alibi witnesses, but ordered the investigation stopped when the investigator failed to locate any patrons or employees who could confirm that defendant was at the bar that night. Rather, counsel testified that he determined that both the investigator's time and pretrial resources would be better spent interviewing the

State's potential witnesses. Moreover, counsel testified that defendant never informed him that he had loaned the Cadillac to another patron who had the vehicle at the time the incident occurred, but that defendant stated he had been driving in the vicinity of the incident some time after 11:45 p.m. Counsel therefore made no efforts to locate or interview this alleged patron.

Trial counsel, with the aid of an investigator, attempted to follow up on the information that defendant gave him. When no exculpatory evidence was forthcoming, and because defendant told counsel that he had been in the vicinity of the crime that night, trial counsel made the tactical decision to cease the investigation and to concentrate on the State's primary witnesses. We cannot say trial counsel's decision to cease trying to locate potential alibi witnesses was anything less than a reasonable tactical decision, and we therefore affirm the trial court's denial of defendant's motion for a new trial on this ground.

■■■ Alternatively, defendant contends that the trial court erred in denying his motion for a new trial because counsel failed

---

**8.** In denying defendant's motion for a new trial, the trial court entered eighteen detailed findings of fact supporting its conclusion that "there [was] no error or impropriety in [counsel's performance]." Defendant has not successfully challenged these findings and we accept them for purposes of our analysis.

In part, the trial court found:

11. That, at the Hearing on the instant Motion, [trial counsel] testified:

(a) That, during preparation for trial, defendant told [trial counsel] the former departed the bar in his motor vehicle at approximately 11:45 p.m..

(b) That defendant told [trial counsel] he had witnesses which [sic] could place him in the bar the evening the offense occurred.

(c) That defendant told [trial counsel] he was driving his motor vehicle in the vicinity of the location the offense occurred.

(d) That defendant never told [trial counsel] he had loaned his motor vehicle to another bar patron, prior to the time the offenses occurred, nor the name of that patron.

(e) That [trial counsel] directed his investigator to concentrate the investigator's efforts on plaintiff's witnesses and their written statements because defendant had told [trial counsel] he drove his motor vehicle away from the bar approximately one-half hour before the offense occurred.

(f) That because of defendant's statements to [trial counsel], witnesses at the bar could only place defendant there[ ] until 11:45 p.m., and any testimony by these witnesses would not be helpful to defendant at trial.

. . . .

13. That defendant easily could have driven from the location of the bar to the location where the offenses occurred between 11:45 p.m. and 12:15 a.m..

14. That, upon his arrest, defendant did not tell the police he had loaned his motor vehicle to a bar patron.

15. That, at the Hearing on the instant Motion, defendant testified:

(a) That he had not told [trial counsel] the identity of the bar patron who borrowed his motor vehicle.

(b) That he did not presently know the whereabouts of the bar patron.

16. That it is not credible that defendant would not have told [trial counsel] a bar patron had borrowed his motor vehicle and the identity of that patron.

17. That [trial counsel] did not expend resources, in interviewing the bar witnesses who could place defendant at the bar until 11:45 p.m., is reasonable in view of defendant's admission to [trial counsel] that he departed the bar at that time.

to submit a jury instruction on aggravated assault. Trial counsel requested the jury be instructed as to the lesser included offense of kidnapping, but failed to request an instruction as to the lesser included offense of aggravated assault.

On appeal, defendant relies on *State v. Brown,* 694 P.2d 587 (Utah 1984), to support his claim. Like defendant in the instant case, the defendant in *Brown* was convicted of aggravated kidnapping. However, in *Brown,* trial counsel's theory of the case was that the victim started the altercation and the defendant simply responded to her behavior. Thus, trial counsel admitted the defendant's culpability for the lesser included offense of assault. *Id.* at 590. On appeal, the defendant alleged the *trial court* erred by failing to give the defendant's *requested* aggravated assault instruction. The supreme court agreed and found that, although the defendant's testimony regarding the incident may not have appeared particularly credible, he was nevertheless entitled to present his theory of the case to the jury. *Id.*

At its heart, *Brown* addresses *trial court* error, not *trial counsel* error. Defendant does not challenge the trial court's failure to give a requested jury instruction; rather, defendant challenges trial counsel's chosen defense strategy.

Trial counsel's strategy below was to claim misidentification, or alternatively, to demonstrate that the State had failed to show any aggravation, not that defendant was involved in a lesser crime of aggravated assault. Indeed, at the hearing on counsel's motion to withdraw, trial counsel indicated that to have requested an aggravated assault instruction would have been wholly "incompatible" with his strategy.

An ineffectiveness claim "succeeds only when no conceivable legitimate tactic or strategy can be surmised from counsel's actions." *Tennyson,* 850 P.2d at 468 (citing *State v. Moritzsky,* 771 P.2d 688, 692 (Utah App.1989)). Moreover, "this court will not second-guess trial counsel's legitimate strategic choices, however flawed those choices might appear in retrospect." *Id.* at 465 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at

2065); *see Kubat v. Thieret,* 867 F.2d 351, 364–65 (7th Cir.) (rejecting ineffectiveness claim where trial counsel could reasonably have chosen not to submit lesser included offense instruction to avoid weakening alibi defense), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). The record in the instant case supports the conclusion that trial counsel's failure to request an instruction on aggravated assault was consistent with his trial strategy. The trial court therefore did not abuse its discretion in determining that counsel was not ineffective.

## INSUFFICIENT EVIDENCE

■■■■ Next, defendant contends there is insufficient evidence to support his jury conviction of aggravated kidnapping. Defendant argues that a person commits aggravated kidnapping only when he or she detains or restrains another "for any substantial period." Relying on *State v. Couch,* 635 P.2d 89 (Utah 1981), defendant asserts that the period of detention necessary to support a charge of kidnapping constitutes a period of detention longer than the minimum required to commit a sexual assault or robbery. Thus, he insists that as a matter of law kidnapping cannot occur when the victim is detained the short period of time evidenced by the facts before us.

The State responds that section 76–5–301(1)(a), under which *Couch* was decided, expressly limits the temporal circumstances under which a detention will constitute a kidnapping, but argues that section 76–5–302, the provision under which defendant was convicted, is devoid of such a temporal element for aggravated kidnapping. *See* Utah Code Ann. § 76–5–301(1)(a) (1995). We agree.

Section 76–5–302(1) reads in pertinent part:

(1) A person commits aggravated kidnaping if the person intentionally or knowingly, without authority of law and against the will of the victim, *by any means and in any manner,* seizes, confines, detains, or transports the victim with intent:

. . . .

(c) *to inflict bodily injury on or to terrorize the victim or another;*

Utah Code Ann. § 76–5–302(1)(c) (1995) (emphasis added).

Nowhere does this statute require the victim be detained or restrained for *any* period of time before the crime of aggravated kidnapping occurs. As noted by the Montana Supreme Court in *State v. Smith*, 228 Mont. 258, 742 P.2d 451 (1987): [9]

> The statute requires no specific proof regarding duration of restraint. If a specific period of time were required, then a fortunate escape by the victim, short of that specified length of time, would cut short the defendant's liability regardless of defendant's purpose or actions. Time is not the concern of the statute, but, rather, concern is for violence, terror, and danger when the victim is restrained.

*Id.* at 454; *see also State v. Moore*, 77 N.C.App. 553, 335 S.E.2d 535, 538 (1985) (stating it was not intent of legislature to " 'make resort to a ... stop watch ... in determining whether the crime of kidnapping has been committed.' " (quoting *State v. Fulcher*, 294 N.C. 503, 243 S.E.2d 338, 351 (1978))), *aff'd*, 317 N.C. 144, 343 S.E.2d 430 (1986). It is the element of restraint with the intent to inflict injury or terrorize, not the length of the restraint, which constitutes an aggravated kidnapping under Utah law.

Thus, the record clearly supports the jury's verdict convicting defendant of aggravated kidnapping.

## FIFTEEN–YEAR MINIMUM MANDATORY SENTENCE

Finally, defendant contends the trial court erred when it sentenced him to fifteen years in prison, the most severe minimum mandatory sentence for aggravated kidnapping provided under Utah Code Ann. § 76–5–302(3) (1995).

Defendant argues the trial court's finding that "the victim was particularly vulnerable as she was approached from behind, at night, while she was in the process of placing groceries in her motor vehicle" was error. Defendant claims that a child, an elderly person, or a physically or mentally disabled person could properly be characterized as a vulnerable victim for purposes of sentencing, but that an adult female alone at night cannot.

We need not reach this issue. Even if the trial court erred when it considered an adult female alone at night to be a vulnerable victim for purposes of imposing its sentence, the error was harmless. *See State v. Archuleta*, 850 P.2d 1232, 1247–48 (Utah 1993) (holding consideration of invalid aggravating circumstance at sentencing harmless where one or more remaining aggravating factors outweigh mitigating factors), *cert. denied*, —— U.S. ——, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993); [10] *State v. Russell*, 791 P.2d 188, 192 (Utah 1990) (finding any error in citing inappropriate factor "together with additional aggravating factors" harmless).[11]

---

**9.** In relevant part, Montana's aggravated kidnapping statute similarly provides:

> A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person ... by using or threatening to use physical force, with any of the following purposes:
>
> ....
>
> (c) to inflict bodily injury on or to terrorize the victim or another....

Mont.Code Ann. § 45–5–303(1) (1987).

**10.** In *Archuleta*, a death penalty case, at the defendant's penalty hearing, the jury considered, along with other factors, the aggravating circumstance of object rape. This aggravating circumstance was later invalidated by the supreme court. The court concluded, however, that the invalidation of a statutory aggravating circumstance considered by the jury at sentencing did not require an automatic reversal of the defen-

dant's death sentence. *Archuleta*, 850 P.2d at 1247. Rather, the court reiterated the United States Supreme Court's holding that "an appellate court that invalidates one or more aggravating circumstances found by the jury may still affirm imposition of the [sentence] if the appellate court finds that one or more valid remaining aggravating circumstances outweigh the mitigating circumstances." *Id.* (citing *Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725 (1990)). Further, the court found that an appellate court may make this finding by either reweighing the aggravating and mitigating circumstances or by applying a harmless error review. *Id.*

**11.** In *Russell*, the trial court sentenced the defendant to the most severe minimum mandatory term for the offense of aggravated sexual assault. In part, the court found that defendant's age

In its Findings of Fact and Conclusions of Law, the trial court found other aggravating circumstances adequate to support the fifteen-year minimum mandatory sentence that it imposed. As required by Utah Code Ann. § 76-3-201(7)(b) (1995), the trial court made written findings as to the mitigating and aggravating circumstances it found in connection with the offense. Based on the record before us, the court found no mitigating circumstances and articulated the following aggravating circumstances:

1. That defendant has established instances of repetitive conduct.

2. That defendant's criminal conduct has escalated from those of property to those against the person.

. . . .

4. That defendant was armed with a dangerous weapon which he held to the throat of the victim.

5. That defendant continues to deny any involvement in the crime in the face of abundant, credible evidence.

We conclude the gravamen of the trial court's decision to impose the maximum sentence was the repetitive and increasingly violent behavior of defendant and that these aggravating factors outweighed any in mitigation; thus we affirm defendant's sentence.

## CONCLUSION

Based upon the totality of the circumstances underlying the victim's eyewitness identification, we find it reliable and therefore hold that the trial court did not err when it admitted the identification at trial. We conclude that defendant received effective assistance of counsel at trial, and that the State presented sufficient evidence to support each element of aggravated kidnapping. Finally, we determine the trial court found sufficient aggravating factors to outweigh any mitigat-

ing factors and thus affirm the imposition of a fifteen-year minimum mandatory sentence.

ORME, P.J., concurs.

BENCH, Judge (concurring in result in part):

Because the main opinion applies an erroneous standard of review to the claim of ineffective assistance of counsel, I concur only in the result of that section. I concur outright in the balance of the opinion.

In a motion for a new trial, defendant claimed his trial counsel had been ineffective. The trial court held an evidentiary hearing on this claim and allowed defendant the opportunity of establishing, on the record, how counsel was ineffective. At the hearing, trial counsel explained why he tried the case as he did. The trial court weighed the evidence and concluded that trial counsel was effective. We should give the trial court's determination broad deference. *See State v. Pena*, 869 P.2d 932, 935-39 (Utah 1994).

The main opinion correctly recognizes that the mandate of *Pena* applies where mixed questions of law and fact are involved. The main opinion properly applies *Pena* in its "Show Up Identification" section. The main opinion also correctly recognizes that a claim of ineffective assistance of counsel "presents a mixed question of law and fact." In analyzing the ineffective assistance issue, the main opinion then proceeds to ignore its own analysis of *Pena* and to erroneously apply the "wooden" law/fact distinction criticized by *Pena*. Based on its failure to properly apply *Pena*, the main opinion mistakenly concludes that our review of ineffective assistance claims is de novo.

As discussed by the main opinion, the *Pena* court cited a number of reasons for

constituted a mitigating factor, but that the aggravating circumstances—namely, the severity of the offenses, the manner of their commission, the defendant's lack of regard for the victims' safety, the extent of physical and emotional trauma suffered by the victims, the extent of the defendant's juvenile record, and the defendant's failure to respond to rehabilitative treatment and his apparent unwillingness to cease criminal activity—substantially outweighed the mitigating circum-

stance. *Russell*, 791 P.2d at 192. On appeal, the supreme court found the trial court's reliance on the "severity of the offenses" was misplaced because the legislature had already considered the severity of the crime when it made aggravated sexual assault subject to the minimum mandatory sentencing statute. *Id.* The court found further, however, that any error in citing the severity of the offenses was harmless and therefore upheld the trial court's sentence. *Id.*

granting broad discretion to a trial court's application of law to fact:

> (i) when the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out; (ii) when the situation to which the legal principle to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative; and (iii) when the trial judge has observed "facts," such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to the appellate courts.

*Pena,* 869 P.2d at 939 (citing Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above,* 22 Syracuse L.Rev. 635, 662–63 (1971)).

The main opinion erroneously argues that because fundamental Sixth Amendment rights are involved in this case, it follows that our review of ineffective assistance claims must be de novo. This argument is specious. In *Pena,* the issue involved the standard of review to be applied to reasonable-suspicion determinations. Reasonable suspicion, like ineffective assistance of counsel, implicates fundamental constitutional rights. However, this consideration did not influence the supreme court to automatically require a de novo review. Instead, the court relied upon the factors it had set out in determining the level of review.

> We conclude that the proper standard of review to be applied to a trial court determination of whether a specific set of facts gives rise to reasonable suspicion is a determination of law and is reviewable non-deferentially for correctness, as opposed to being a fact determination reviewable for clear error. We further conclude that the reasonable-suspicion legal standard is one that conveys a measure of discretion to the trial judge when applying that standard to a given set of facts. . . .

Our decision to characterize the review as something less than de novo is largely due to the first factor spelled out by Professor Rosenberg: Reasonable-suspicion determinations are highly fact dependent, and the fact patterns are quite variable. It would be impractical for an appellate court to review every reasonable suspicion determination de novo and then pronounce whether each unique factual setting rises to the level of reasonable-suspicion as a matter of law. If we were to try, it is likely that the resulting case law would be confusing and inconsistent.

*Pena,* 869 P.2d at 939–40 (footnotes omitted). Other recent cases have similarly treated issues involving fundamental constitutional rights. *See, e.g., State v. Poole,* 871 P.2d 531, 533 (Utah 1994) (determinations of probable cause entitled to same discretion as determinations of reasonable suspicion); *State v. Strausberg,* 895 P.2d 831, 834 n. 5 (Utah App.1995) (determination of custody for Miranda purposes entitled to broad discretion); *State v. J.D.W.,* 259 Utah Adv.Rep. 22, 23, —— P.2d ——, —— (Utah App.1995) (determination of entrapment entitled to broad discretion); *State v. Teuscher,* 883 P.2d 922, 929 (Utah App.1994) (determination of custody for Miranda purposes entitled to broad discretion); *State v. Nguyen,* 878 P.2d 1183, 1185–86 (Utah App.1994) (determinations of reasonable suspicion and probable cause entitled to deference).

The trial court's determination of whether defendant's trial counsel was effective is entitled to broad discretion under *Pena*'s first and third criteria. Like the reasonable-suspicion determination in *Pena,* ineffective assistance of counsel claims are "highly fact dependent, and the fact patterns are quite variable" such that "no rule adequately addressing the relevance of all these facts can be spelled out." *Pena,* 869 P.2d at 939–40. Additionally, "[i]t would be impractical for an appellate court to review every [ineffective assistance of counsel] determination de novo and then pronounce whether each unique factual setting rises to the level of [ineffective assistance of counsel] as a matter of law." *Id.* Finally, the trial court is in the best position to observe facts, such as trial counsel's "appearance and demeanor" at the evidentiary hearing and his actions at trial, which are relevant to the determination of whether trial counsel was effective. *Id.* at

939. Therefore, the main opinion errs by reviewing this claim de novo.[12]

*Pena*'s general rule is that we will give deference to the trial court's resolution of mixed questions of fact and law. There are currently just two exceptions to this general rule: voluntariness of consent and, after today's decision, ineffectiveness of counsel. Henceforth, these two claims will be reviewed de novo, in our wisdom, without any deference to what the trial court determined.

No one has really articulated why we review some mixed questions more searchingly than others. I seriously doubt that anyone can. By definition, mixed questions are all fact sensitive and many also involve constitutional questions. It is inconsistent and confusing for us to review most questions under a deferential standard, but not all. At a time when we are complaining about a growing backlog of appeals, it also seems strange that we would actively encourage the filing of appeals in certain areas. I am particularly concerned about opening the floodgates for claims of ineffective assistance of counsel because the claim could be made in virtually every criminal case. Indeed, it might be argued that an attorney who does not claim on appeal that trial counsel was ineffective is himself or herself ineffective or perhaps even guilty of malpractice.

The deference standard does not, in any way, abdicate our responsibility or insulate from review an erroneous decision of the trial court. If a trial court's decision is truly out-of-line, we can correct it, as explained in *Pena*, even under the deference standard. We must restrain ourselves, however, from even suggesting we are engaged in a de novo review of fact-sensitive issues.

The main opinion errs by ignoring the mandate of *Pena* and by applying a nonde-ferential standard of review to its analysis of defendant's claim of ineffective assistance of counsel. However, because on this issue the main opinion reaches the right outcome, I concur in the result.

---

12. Ineffective assistance cases decided after *Pena* have been less than precise in their articulation of a standard of review. *See* main opinion at n. 7. It is not accurate to conclude, however, that because there was no articulation of a standard of review in these decisions it must necessarily have been a de novo review. In any event, under *Pena*, our review of this issue should not be de novo.